United States District Court
Southern District of Texas
**ENTERED**
July 21, 2023
Nathan Ochsner, Clerk

# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF TEXAS
# HOUSTON DIVISION

| | | |
|---|---|---|
| Rachael Crivelli,<br>    *Plaintiff,* | § § § | |
| v. | § | Civil Action H-21-2336 |
| | § | |
| City of Katy,<br>    *Defendant.* | § § | |

## MEMORANDUM AND RECOMMENDATION

Pending before the court are Defendant's Motion for Summary Judgment, ECF No. 24, and Objections to Plaintiff's Summary Judgment Proof and Motion to Exclude, ECF No. 31. The motions are before the undersigned magistrate judge pursuant to 28 U.S.C. § 636(b)(1). The undersigned recommends that Defendant's summary judgment motion be **GRANTED**. Defendant's objections are **DENIED** as moot, and the motion to exclude is **DENIED**.

### 1. Background[1]

Plaintiff Rachael Crivelli is a firefighter who served in several Houston-area fire departments for nearly twenty years. Crivelli's Decl. ¶ 1, ECF No. 29-1. Just prior to the dispute giving rise to this case, Crivelli was a firefighter with Montgomery County Emergency Services District, No. 7 (MCESD7). *Id.* While there, she complained about gender discrimination, and the

---

[1] The majority of this factual background is taken from Crivelli's Declaration. ECF No. 29-1. The court recognizes that Crivelli's response to the complaints on which KFD based the termination of her employment and the notes that Crivelli represents were transcribed from her phone both contain very similar accounts of her experiences at KFD as described in her declaration. *Compare* ECF No. 29-1 *with* ECF Nos. 29-4, 29-6.

investigation into her complaint culminated in the firing of the fire chief. *Id.* Crivelli "was later terminated from MCESD7 for allegedly failing a physical fitness test." *Id.* Crivelli filed a lawsuit, alleging gender discrimination, retaliation, and "retaliatory sabotage of her post-termination employment." *Crivelli v. Montgomery Cnty. Emergency Servs. Dist. No. 7,* No. 22-20312, 2023 WL 2823065, at *1 (5th Cir. Apr. 7, 2023); *see also* Crivelli's Decl. ¶ 1. The district court granted MCESD7's motion for summary judgment, and the Fifth Circuit Court of Appeals affirmed the decision. *Crivelli,* 2023 WL 2823065, at *1.

After MCESD7 terminated Crivelli's employment, Katy Fire Department (KFD) hired her in July 2018 "as an entry-level and probationary firefighter" assigned to Shift B. Crivelli's Decl. ¶ 2; *see also id.* at ¶ 43. According to Crivelli, "[f]rom virtually the first day of work, [she] was treated differently than other similarly situated male firefighters." *Id.* ¶ 4. Within the first few days of starting work at KFD, Crivelli was called into the captain's office to give an opinion about the decision-making of a female firefighter who was in charge on a call for medical service. *Id.* ¶ 9. Crivelli asserted that she felt she "was being pressured into saying [Firefighter June] Ha messed up." *Id.* Crivelli also had observed Ha being ignored and openly criticized. *Id.* ¶ 50. For example, Ha failed a "mega code test" because one of the male firefighters "sabotaged" the test by not following Ha's instruction to stop cardiopulmonary resuscitation. *Id.* Crivelli later overheard the male firefighter "bragging that [Ha] failed." *Id.*

Crivelli described multiple negative interactions she had with Firefighter Pedro Jarquin:

- Jarquin told Crivelli "to get the fuck off the truck very sternly" just as the engine was to be taken to answer a call. Crivelli's Decl. ¶ 11. Lieutenant

2

Benjamin Crowell asked what had happened and, upon hearing Crivelli's account, told her "to put [Jarquin] in his place[;] he has an attitude[;] and you have more experience th[a]n him[;] don't let him push you around." *Id.*

- In Jarquin's presence, Crivelli said she had more experience than both Jarquin and another firefighter, to which Jarquin responded, "Are you kidding? You are nobody. You have no experience. I worked with people who know you[,] and I have actual fire experience so don't try to lie." *Id.* ¶ 12.

- Jarquin told Crivelli she did not belong in a conversation he was having over a headset with another firefighter. The same day, Jarquin refused Crivelli's request to roll down the window of the engine, stating that he didn't care about her and whether she was hot. *Id.* ¶ 13.

- Jarquin "began snapping at [Crivelli] and ignoring [her,]" so she asked him "what his deal was" and if he just hated her or hated everyone. *Id.* ¶ 14. He said, "I hate everyone." *Id.*

- In a group of several male and female firefighters, a conversation about women in the military began. *Id.* ¶ 19. "Jarquin stated that all women in general are always trying to prove something and it pisses him off [and that] he was so sick of women trying to prove they can be something they aren't." *Id.* He then brushed by Crivelli. *Id.*

- Jarquin "snapped" at Crivelli while they were making breakfast because she corrected him on what he was doing. *Id.* ¶ 40. He said, "Did you just snap at me? You have no idea who you think you['re] talking to! . . . You have no idea what I can do to you." *Id.*

In September and October 2018, Crivelli had negative interactions with three other male firefighters. *See* Crivelli's Decl.

3

¶¶ 16–17. On one occasion, Crivelli joined them to watch a movie and told them that the one they picked had graphic sex scenes and was not appropriate. They chose to watch it anyway and made comments when the sex scenes played that it was a "little awkward." *Id.* ¶ 16. Crivelli left. *Id.* On another occasion, Crivelli joined a conversation among the three other male firefighters. *Id.* ¶ 17. One said that she always had something to say, and another told her to mind her own business. *Id.* Crivelli walked away. *Id.*

On October 8, 2018, Smith issued Crivelli a fitted ball cap, although caps with adjustable straps were available. Crivelli's Decl. ¶ 18. When Crivelli asked for a cap with a strap to accommodate her ponytail, Smith refused. *Id.* The next morning, Smith would not allow Crivelli to pull an engine out of the bay even though she had the credentials to do so because she needed to "get checked off." Crivelli's Decl. ¶ 20. Later that day, Crivelli asked Smith if she could cut and sew a ponytail hole in the cap he had issued her. *Id.* ¶ 21. Smith said, "Just shave your head." *Id.* After more conversation on the topic in front of others, Smith relented, saying that he did not care if she made a hole in the hat. *Id.* After Crivelli had spent a lot of time modifying the hat, Smith gave Crivelli an older style cap and told her, in front of other firefighters, that the one she had modified made her look like she was "wearing a retards helmet." *Id.* ¶ 22.

In October 2018, Firefighter Travis Lee was having marital problems and asked Crivelli for her advice. Crivelli's Decl. ¶ 26 She told him that he should go home and that his wife "had him whipped and wrapped around her finger." *Id.* Firefighter Lee agreed with her. *Id.* While Firefighter Lee was out, Crivelli showed a picture to Firefighter Jason Clarke that "showed a woman walking a man on a leash through a store" and joked that

it was Firefighter Lee (Leash Incident). *Id.* Everyone who saw the picture laughed and agreed, including Firefighter Lee. *Id.* ¶¶ 27–28. According to Crivelli, other firefighters made jokes about Firefighter Lee, and none were disciplined. *Id.* ¶ 27.

On October 21, 2018, Crivelli met with Crowell and Engine Operator Tyler Ferguson, at which time she informed them of the discrimination charges that she planned to file against MCESD7. Crivelli's Decl. ¶ 31. They told her that they did not need to know about that and pledged her their support. *Id.* Crivelli also "informed them of issues that [she] was having with . . . Jarquin." *Id.* ¶ 32. They told her to "handle it" with Jarquin "before making an official complaint." *Id.* She offered to show Crowell and Ferguson notes that she had taken on her phone "of some of the incidents that she considered problematic[,]" but they declined the opportunity and repeated that she needed to handle it herself. *Id.* They told her that Jarquin "ha[d] been a subject of multiple complaints." *Id.* They also told her that no one had expressed issues with her performance. *Id.*

On October 21, 2018, Smith counseled Crivelli for being late to a training session and ordered her to attend two more hours of training. Crivelli's Decl. ¶ 33. She asked to speak to Smith alone. *Id.* ¶ 34. He agreed but left the door open and told her "that he does not like to have meetings with female firefighters without witnesses for his protection and specifically ones with [her] history." *Id.* He explained that he was "friends with a lot of people" with whom she had worked. *Id.* ¶ 36. Crivelli told Smith that she planned to file discrimination charges against MCESD7. *Id.* ¶ 35. He responded, "[I]f you want a fresh start here[,] I form my own opinions[,] and you will have your fresh start[,] however[,] you're not getting off to a good one because a lot of people here know your past." *Id.* ¶ 36.

On November 2, 2018, Assistant Chief Dana Massey asked Crivelli "how everything was going." Crivelli's Decl. ¶ 39. Crivelli responded that "it was ok, but that it [was] different and hard being a rookie." *Id.* Crivelli said that everyone was treating her well, except for Jarquin, "who doesn't like females in fire service." *Id.*; *see also* Massey's Decl. ¶ 3, ECF No. 24-4 ("Without stating any specifics, . . . Crivelli told me she felt that . . . Jarquin was rude and abusive toward her."). Massey asked if Crivelli wanted to make a complaint, to which Crivelli said that she did not but that she "might give [Jarquin] a piece of [her] mind because [he] was pretty rude." Crivelli's Decl. ¶ 39; *see also* Massey's Decl. ¶ 3. Massey later did not recall that Crivelli attributed Jarquin's rudeness to gender-based discrimination, "although [Massey] was sensitive to the possibility of that." Massey's Decl. ¶ 3.

Shortly thereafter, Massey told Assistant Chief Kenneth Parker, who was at the time the assistant fire chief of operations, that Crivelli had reported "having difficulties" with Jarquin. Parker's Decl. ¶ 5, ECF No. 24-3; *see also* Massey's Decl. ¶ 3 (stating that she told Parker "about the substance of what Crivelli had told [her] about the interactions with . . . Jarquin"). According to Parker, "Massey did not describe it as sexual or gender-based harassment or discrimination but rather as a personality conflict." Parker's Decl. ¶ 5. Parker then discussed the matter with Smith on November 7, 2018, describing it as "an alleged personality conflict[.]" *Id.; see also* Smith's Decl. ¶ 8, ECF No. 24-5 (stating that Parker said that "an informal, unwritten complaint [had been] made by Crivelli about Jarquin"). Neither Parker's nor Smith's testimony reflects whether Parker asked Smith to investigate the matter or to take any action whatsoever. *See* Parker's Decl. ¶ 5; Smith's Decl. ¶ 8.

6

Later that evening, nevertheless, Smith "spoke with Jarquin about his attitude and conduct that others (without naming names) on the Shift may [have] regard[ed] as rude" and asked Jarquin if he was having problems with anyone. Smith's Decl. ¶ 8. Jarquin admitted that he and Crivelli "had been in a verbal dispute[,]" after which Crivelli told Jarquin that she thought he did not like her. *Id.* Jarquin said that he responded, "I don't have a problem with you." *Id.* Jarquin said that he avoided her during personal time and that he knew others "were having issues with Crivelli's attitude or conduct toward them." *Id.* Smith later interviewed other employees on Shift B, whom he does not identify in his declaration, "about morale in general." *Id.* ¶ 9. A few other employees reported issues with Crivelli. *Id.* Several also reported being upset about the Leash Incident. *Id.*

On November 13, 2018, Crivelli told Lieutenant Lee[2] that she "did not feel as if [she] was fitting in at Katy[,] . . . that [she] did not believe that [Battalion Chief Jordan] Smith cared for [her]. . . . [and] that she was treated like an outcast." Lieutenant Lee encouraged her to try other shifts before leaving KFD. *Id.* ¶ 43.

On November 14, 2018, Crivelli "suggested playing a game where someone draws a picture or words on the other person's back and that person attempts to guess [what it is]" (Drawing Incident). Crivelli's Decl. ¶ 45. Crivelli "drew a rifle or gun" on Firefighter Lee's back. Firefighter Lee and Firefighter Paul Briscoe said that they thought Crivelli had drawn a penis. *Id.* Crivelli agreed that it was a penis and said, according to her, "in

---

[2] Crivelli does not provide Lieutenant Lee's first name, and the court cannot locate it in the record. Crivelli refers to this person only as "LT Lee." Crivelli Decl. ¶ 43. This is not the same "Lee" as Firefighter Lee who was the subject of the Leash Incident.

a sarcastic tone of voice," "[T]hat is my favorite thing to draw." *Id.* According to Crivelli, everyone laughed. *Id.*

Briscoe reported the Drawing Incident to Smith later that day. Smith's Decl. ¶ 10. Clarke reported the Leash Incident on the same day. *Id.* Based on Smith's conversations with Jarquin, others on Shift B, and Briscoe's and Clarke's reports, Smith requested that a formal investigation be conducted into Crivelli's conduct. *Id.* ¶ 11; *see also* ECF No. 24-3 at 124–25. In a memorandum to Parker, who was tasked with conducting personnel investigations, Smith listed several incidents that he believed involved potential misconduct on Crivelli's part, including the Leash Incident and Drawing Incident. *See* ECF No. 24-3 at 124–25; Parker's Decl. ¶ 2.

On November 19, 2018, Parker placed Crivelli on administrative leave pending investigation of the allegations reported by Smith. Parker's Decl. ¶ 7; Crivelli's Decl. ¶ 47; *see also* ECF No. 24-3 at 126–27. Parker conducted the investigation by "soliciting written statements" from Smith, Lieutenant Justin Hardy, Captain Oscar Villegas, and Firefighters Lee, Clarke, and Briscoe. Parker's Decl. ¶ 7; *see also* ECF No. 24-3 at 130–36. Crivelli was not interviewed during the investigation and was never contacted by a supervisor to discuss the reasons for placing her on administrative leave. Crivelli's Decl.¶ 48.

On November 29, 2018, Parker notified Crivelli, both in person and in writing, of "three specific violations [that he] would be investigating." Parker's Decl. ¶ 7; *see also* Crivelli's Decl. ¶ 49; ECF No. 24-3 at 137–38. The three violations were (1) the Drawing Incident; (2) the Leash Incident; and (3) failure to follow the orders of a paramedic while on a call on November 7, 2018. *See* ECF No. 24-3 at 137. Parker advised Crivelli that, if she

wanted to respond to the allegations, she needed to do so in writing and needed to submit her response in less than twenty-four hours from having received notification. *See* ECF No. 24-3 at 137, 139.

Crivelli responded on November 30, 2018. *See* ECF 24-3 at 139. In her response, Crivelli first requested additional time and then proceeded to address each of the incidents Parker intended to investigate as well as other issues that Smith raised in his November 19 memorandum to Parker. *Id.* at 139–41; *see also* Parker's Decl. ¶ 7. Crivelli argued that the incidents were "minor and [did] not violate policy and procedures[,]" did not "rise to the level of requiring disciplinary or other action[,]" and were not "out of the ordinary for the fire departments." ECF No. 24-3 at 139. She also argued that, while not appropriate, the Drawing Incident was taken out of context and that the Leash Incident was not related to mental health or sexual in nature and was a joke that made everyone laugh. ECF 24-3 at 139–40. Crivelli also argued that she had "acted as a proper firefighter based on [her] experience, ability, and knowledge" during the November 7, 2018 call. *Id.* at 140. Crivelli asserted that the "allegations appear[ed] to be designed to retaliate against me for engag[ing] in protected activity by complaining of discrimination and retaliation against my former employer." ECF No. 24-3 at 139. At Parker's request, Smith submitted a memorandum on December 5, 2018, that addressed several issues Crivelli raised in her response. *See* Parker's Decl. ¶ 7; ECF No. 24-3 at 142–43.

Parker reported his findings to Fire Chief Russell Wilson, identifying the Leash Incident and Drawing Incident as violations of city and department policy against harassment. *See* ECF No. 24-3 at 144–48. Parker did not recommend any disciplinary action. *See id.* Wilson terminated Crivelli's

employment on December 19, 2018. Crivelli's Decl. ¶ 49; *see also* Wilson's Decl. ¶ 4, ECF No. 24-2.

Crivelli filed this lawsuit on July 19, 2021, alleging gender discrimination and retaliation in violation of Title VII of the Civil Rights Act of 1964 (Title VII), 42 U.S.C. §§ 2000e–2000e-17. ECF No. 1. Defendant filed its motion for summary judgment on October 29, 2022, and its motion to exclude evidence on December 27, 2022. *See* ECF Nos. 24, 31. The court held a hearing on the motions. *See* May 18, 2023 Min. Entry.

### 2. Summary Judgment Standard

"Summary judgment is appropriate only if, viewing the evidence in the light most favorable to the nonmovant, 'the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" *Davenport v. Edward D. Jones & Co.*, 891 F.3d 162, 167 (5th Cir. 2018) (quoting Fed. R. Civ. P. 56(a)). No genuine issue of material fact exists if a rational jury could not find for the nonmoving party based on the complete record. *McMichael v. Transocean Offshore Deepwater Drilling, Inc.*, 934 F.3d 447, 455 (5th Cir. 2019) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).

Initially, "[t]he movant bears the burden of identifying those portions of the record it believes demonstrate the absence of a genuine issue of material fact." *Lincoln Gen. Ins. Co. v. Reyna*, 401 F.3d 347, 349 (5th Cir. 2005) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–25 (1986)). If this burden is met, the nonmovant must then "go beyond the pleadings," using competent summary judgment evidence to cite "specific facts" showing a genuine issue for trial. *McCarty v. Hillstone Rest. Grp., Inc.*, 864 F.3d 354, 357 (5th Cir. 2017) (quoting *Boudreaux v. Swift Transp. Co.*, 402 F.3d 536, 540 (5th Cir. 2005)).

The court reviews all evidence and reasonable inferences in the light most favorable to the nonmoving party. *See Tolan v. Cotton*, 572 U.S. 650, 657 (2014) (quoting *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970)). The court, however, does not have a duty "to search the record for material fact issues." *RSR Corp. v. Int'l Ins. Co.*, 612 F.3d 851, 857 (5th Cir. 2010) ("Rather, the party opposing the summary judgment is required to identify specific evidence in the record and to articulate precisely how this evidence supports [the] claim."). Although the court needs to consider only the cited evidence, it is allowed to consider other materials in the summary judgment record. Fed. R. Civ. P. 56(c)(3).

"[C]onclusory allegations, unsubstantiated assertions, or 'only a scintilla of evidence'" are not enough to defeat a properly supported motion for summary judgment. *Turner v. Baylor Richardson Med. Ctr.*, 476 F.3d 337, 343 (5th Cir. 2007) (quoting *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994)). "[T]here must be evidence on which the jury could reasonably find for the [nonmovant]." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986).

### 3. Defendant's Objections to the Evidence

On summary judgment, a party may object to exhibits that "cannot be presented in a form that would be admissible in evidence." Fed. R. Civ. P. 56(c)(2); *LSR Consulting, LLC v. Wells Fargo Bank, N.A.*, 835 F.3d 530, 534 (5th Cir. 2016) (quoting Fed. R. Civ. P. 56(c)(2)) ("At the summary judgment stage, materials cited to support or dispute a fact need only be *capable* of being 'presented in a form that would be admissible in evidence.'"). Declarations are competent summary judgment evidence if they are "made on personal knowledge, set out facts that would be admissible in evidence, and show that the . . . declarant is

11

competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4).

Defendant objects to and moves to exclude Paragraph 32 of Plaintiff's Declaration, which discusses notes purportedly transcribed from her phone, on the ground that she failed to disclose the transcribed notes in discovery and testified at her deposition that no such document existed. ECF No. 31 at 1. Defendant also moves to exclude the transcribed notes, which were first presented as Exhibit 4 to Plaintiff's motion for summary judgment, ECF No. 29-4, on the grounds that they were not timely produced and are not properly authenticated. *Id.* at 1, 7. Finally, Defendant argues that the sham-affidavit doctrine applies to prevent consideration of both Paragraph 32 and Exhibit 4. *Id.* at 9.

In discovery, Defendant requested that Plaintiff produce:

> Any diary, journal, notes, or calendar (including in electronic form) kept by you from January 2018 to the present containing any information regarding any facts pertinent to your claims in this lawsuit, including but not limited to any meetings or communications with any current or former City employees or officials regarding your termination.

ECF No. 31-1 at 5. Plaintiff responded that she had "no responsive documents." *Id.* Defendant argues that, although Plaintiff later complied with the court's order to supplement certain interrogatory responses by providing much of the information now contained in Exhibit 4, she did not produce the document itself. ECF No. 31 at 2, 5; *see also* ECF No. 23.

At her deposition, Plaintiff testified that she kept a contemporaneous record on her phone of her experiences at KFD. ECF No. 24-1 at 106. Plaintiff testified that she read the notes from her phone to Crowell and Ferguson when she told them

about her issues with Jarquin. *Id.* at 155–56. Plaintiff testified that she "presented [the phone] to them to read, and they told [her that she] needed to work it out with [Jarquin]." *Id.* at 156. Plaintiff recalled that Crowell's response to her offering the phone to him was to say, "[J]ust tell us what's going on." *Id.* at 157. Plaintiff later submitted the notes as a Word document to her attorney. *Id.* at 106–07; *see also* ECF No. 32 at 2 (stating in Plaintiff's response that the notes were first written in her phone and later put into a Word document). She explained in her deposition that her version of the notes contained run-on sentences, poor grammar, and no quotation marks. *Id.* at 109. Exhibit 4 is written with added punctuation and quotation marks. *See* ECF No. 29-4.

Paragraph 32 states:

> 32. I also informed [Crowell and Ferguson] of issues that I was having with FF Pedro Jarquin. I was told to handle it between ourselves before making an official complaint. I had taken notes on my phone of some of the incidents that I considered problematic. These notes are attached as Exhibit 4 to this motion. I took these notes on my phone and then later transferred them to a Word document. I tried to show these written notes to my supervisors. Both refused to review the written documentation and again told me that I needed to handle it myself. I stated that I had tried and they said FF Pedro has been a subject of multiple complaints. I then asked if anyone had issues with my performance and they stated that there were no issues, and in fact, I was working too hard and needed to share the load.

ECF No. 29-1 ¶ 32.

Plaintiff argues that, "[w]hether the notes are excluded or not does not change the fact that [Plaintiff] attempted to present the notes to her supervisors, was rebuffed . . . . [and,] [i]n direct

contrast, whatever complaints that were lodged against [Plaintiff] by the male firefighters were investigated and solicited to be put into written form." ECF No. 32 at 1. Plaintiff's counsel admitted, however, that he dropped the ball by not timely turning over the Word document that is now Exhibit 4. *See id.* at 2–3.

The account of events presented in Exhibit 4 can be found in other evidence that was timely produced. *See, e.g.,* ECF Nos. 24-1, 29-1, 29-4, 29-6. The court thus understands the actual dispute to be whether Plaintiff presented a *written* complaint to Crowell and Ferguson. *See* ECF No. 24 at 17–18 (citing Tex. Gov't Code §§ 614.022, 614.023) (arguing that a written complaint is necessary to trigger disciplinary action against a firefighter); *Cf.* ECF No. 31 at 8; ECF No. 32 at 1. Although Plaintiff's declaratory statement about presenting "written documentation" is inartful, it is not "so markedly inconsistent" with her deposition testimony "as to constitute an obvious sham" as Defendant argues. *See* ECF No. 31 at 8 (quoting *Winzer v. Kaufman Cnty.*, 916 F.3d 464, 472 (5th Cir. 2019) (discussing the sham affidavit doctrine)); ECF No. 29-1 ¶ 32. To resolve the pending summary judgment motion, the court need not decide whether Plaintiff presented a written complaint and thus finds it unnecessary to strike either Exhibit 4 or paragraph 32 of Plaintiff's declaration. Moreover, the contents of both Exhibit 4 and Plaintiff's declaration are capable of being presented in admissible form, for example, by presenting Plaintiff as a witness at trial when Defendant would be able to cross-examine her. *See LSR Consulting, LLC*, 835 F.3d at 534.

Because the court finds that summary judgment is warranted, as discussed below, even considering both Paragraph

32 and Exhibit 4, Defendant's objections are **DENIED** as moot and the motion to exclude is **DENIED**.

### 4. Summary Judgment Analysis

KFD seeks summary judgment on Crivelli's claims of gender discrimination and retaliation under Title VII. Crivelli argues that KFD terminated her employment because she is female, in retaliation for reporting gender discrimination at KFD, and in retaliation for filing suit against MCESD7.

Before addressing the individual claims, the court addresses Crivelli's testimony in which she describes other firefighters as being mean to her and complains that she was ignored and treated like an outcast. The court understands Crivelli's complaints to generally describe KFD as an unpleasant place to work. Title VII is not intended to protect employees from difficult places to work or erroneous or arbitrary employment decisions. Title VII is only intended to protect employees from employment decisions that are *motivated by discrimination*. *See Kraft v. Univ. of Tex. Med. Branch*, 775 F. App'x 159, 161 (5th Cir. 2019) (quoting *Bryant v. Compass Grp. USA Inc.*, 413 F.3d 471, 478 (5th Cir. 2005) ("Management does not have to make proper decisions, only non-discriminatory ones.")); *Roberson-King v. La. Workforce Comm'n*, 904 F.3d 377, 381 (5th Cir. 2018) (quoting *LeMaire v. La. Dep't of Transp. & Dev.*, 480 F.3d 383, 391 (5th Cir. 2007)) ("[T]he court does not 'engage in second-guessing of an employer's business decisions.'").

### A. Gender Discrimination

Title VII makes it unlawful for an employer "to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to [her] compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national

origin." 42 U.S.C. § 2000e-2(a)(1). When based on circumstantial evidence, as here, these claims are analyzed under the burden-shifting approach outlined in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973); *see also Saketkoo v. Adm'rs. of Tulane Educ. Fund*, 31 F.4th 990, 997 (5th Cir. 2022).

The burden-shifting approach places the initial burden on the plaintiff to establish a prima facie case of gender discrimination, which requires Crivelli to produce evidence showing that she: (1) is a member of a protected group; (2) was qualified for her position of firefighter; (3) suffered an adverse employment action; and (4) was replaced by someone outside her protected group or was treated less favorably than other similarly situated employees outside the protected group. *Carmona v. Dejoy*, No. 22-20064, 2022 WL 16836978, at *1 (5th Cir. Nov. 9, 2022). The defendant must respond by "articulat[ing] a legitimate, non-discriminatory reason for its employment action[,]" and, if the defendant does so, "the ultimate burden shifts back to the plaintiff who must then prove that the employer's proffered reason is merely a pretext for a real discriminatory purpose." *Terry v. Fed. Bureau of Prisons*, No. 23-50130, 2023 WL 4196865, at *4 (5th Cir. June 27, 2023).

As to the prima facie case, it is undisputed that Crivelli is a woman, was qualified for her position, and was terminated. To satisfy the fourth element, Crivelli argues that she was treated less favorably than Jarquin, whom she identifies as a similarly situated employee outside her protected class. To establish disparate treatment, Crivelli must produce evidence showing that KFD treated her "more harshly than 'similarly situated' employees for 'nearly identical' actions." *Vincent v. Coll. of the Mainland*, 703 F. App'x 233, 238 (5th Cir. 2017). Similarly situated means the comparator and Crivelli held the same job or job

responsibilities and shared the same supervisor or had the same decisionmaker determine employment status. *See Alkhawaldeh v. Dow Chem. Co.*, 851 F.3d 422, 426 (5th Cir. 2017). Jarquin and Crivelli both were probationary firefighters on Shift B with Smith as their supervisor. *See* Crivelli's Decl. ¶ 2; Smith's Decl. ¶¶ 7–8. Although there are differences in Jarquin's and Crivelli's alleged actions, the evidence of similarity is enough to raise a fact issue on disparate treatment. Crivelli has met her prima facie summary judgment burden on the gender discrimination claim.

The burden thus shifts to KFD to articulate a legitimate, non-discriminatory reason for terminating Crivelli. *See Terry*, 2023 WL 4196865, at *4. KFD's burden is "only one of production, not persuasion, and involves no credibility assessment." *Id.* KFD produces evidence that Wilson based his decision to terminate Crivelli on policy violations that Parker described in his investigation report. Wilson's Decl. ¶ 4. Violation of the employer's policies is a legitimate reason for termination. *See Holmes v. Thomson Reuters (Tax & Acct.) Inc.*, No. 22-10133, 2023 WL 2823897, at *2 (5th Cir. Apr. 7, 2023).

"After the employer states its [nonretaliatory] reason, the burden shifts back to the employee to demonstrate that the employer's reason is actually a pretext for retaliation." *Feist v. La., Dep't of Just.*, 730 F.3d 450, 454 (5th Cir. 2013). The employee must produce evidence "that the adverse action would not have occurred but for [her] employer's retaliatory motive." *Badgerow v. REJ Props., Inc.*, 974 F.3d 610, 619 (5th Cir. 2020) (alteration in original) (quoting *Feist*, 730 F.3d at 454). Defendant argues that Crivelli produces no evidence showing that the proffered reason was mere pretext for discrimination. The court agrees.

First, because Wilson both hired Crivelli and terminated her knowing she is female, an inference of no discrimination is raised. *See Faruki v. Parsons S.I.P., Inc.*, 123 F.3d 315, 320 n.3 (5th Cir. 1997) ("Where, as here, the same actor hires and fires an employee, an inference that discrimination was not the employer's motive in terminating the employee is created.").

Second, Crivelli does not contest that the Leash Incident and Drawing Incident did in fact occur or that the facts reported about these incidents were accurate. The facts of the two incidents as she relates in her declaration are generally consistent with the facts that the coworkers reported to Smith. *Compare* Crivelli's Decl. ¶¶ 26, 45 *with* Smith's Decl. ¶¶ 9–10. Instead, Crivelli takes issue with the investigation, characterizing it as "a hunt for a reason for termination." ECF No. 29 at 20.

In support of her pretext argument, Crivelli cites *Mastro v. Potomac Electric Power Company*, 447 F.3d 843, 855 (D.C. Cir. 2006), where the court found that the "investigation, which was central to and culminated in Mastro's termination, was not just flawed but inexplicably unfair." In that case, the employer met its burden of proffering a legitimate, nondiscriminatory explanation for terminating the plaintiff by producing evidence that it believed he had lied. *See id.* at 854. But the court found several flaws in the investigation, including that the employee was not interviewed and that the investigation lacked careful, systematic assessments of credibility. *See id.* at 855–57. The court found the flaws in the investigation to be some evidence of the falsity of the employer's proffered reason. *See id.* at 855.

In this case, KFD's proffered reason for termination is that Crivelli violated policy on three occasions. Crivelli does not deny the factual basis of the alleged policy violations, as discussed

18

above. Moreover, Crivelli fails to point to any evidence to raise a fact issue on whether her conduct violated policy. In other words, far from showing any falsity behind KFD's reasons, Crivelli admits that she committed the acts for which she was terminated but simply disagrees with the result. That is not enough. *Cf. Lawson v. AT&T Mobility Servs., L.L.C.*, 800 F. App'x 272, 273 (5th Cir. 2020) (quoting *Amezquita v. Beneficial Tex., Inc.*, 264 F. App'x 379, 386 (5th Cir. 2008) (stating that "even an employer's incorrect belief in the underlying facts—or an improper decision based on those facts—can constitute a legitimate, nondiscriminatory reason for termination.").

Lastly, Crivelli does not connect Jarquin's opinions about women serving as firefighters and in the military to Wilson or, for that matter, any other individual at KFD. Nothing suggests anyone at KFD shared Jarquin's viewpoint or that Jarquin played any role in the decision to terminate Crivelli. Similarly, she does not connect Smith's comments regarding Crivelli's making a hole in a cap for her ponytail to the reasons given for her termination. Even if Smith's behavior was based on gender stereotypes, nothing more than Crivelli's speculation connects them to Smith's informal investigation or Wilson's termination decision.

Crivelli argues that KFD's chain-of-command structure cannot insulate KFD decisionmakers from liability for discrimination merely because "they simply accept the information from below and make their own decisions." ECF No. 29 at 29. Crivelli argues that the "cat's paw" theory prevents that result. *Id.* The "cat's paw" theory holds that discriminatory animus can be imputed to the ultimate decisionmaker if his decision was influenced by someone else who harbored discriminatory animus. *Roberson v. Alltel Info. Servs.*, 373 F.3d

647, 653 (5th Cir. 2004). It applies when the employee "demonstrate[s] discriminatory animus such that it would be necessary to impute illicit motives" to the ultimate decisionmaker. *Id.*

Crivelli argues that Jarquin's beliefs influenced other firefighters, that several firefighters "actively sabotaged another female firefighter . . . under the watchful eye of the Battalion Chiefs and other supervisors[,]" and that KFD initiated the investigation into Crivelli "[a]s a direct result of . . . Jarquin's actions[.]" ECF No. 29 at 29–30. Crivelli fails to raise a fact question whether Jarquin or anyone else held discriminatory animus against Crivelli based on her gender. More importantly, Crivelli cites no evidence that Jarquin or anyone else influenced Wilson's decision. She offers nothing more than unsubstantiated assertions, which are insufficient to defeat a summary judgment motion. *Turner*, 476 F.3d at 343.

Because Crivelli lacks any evidence of pretext, her discrimination claim cannot survive summary judgment. Defendant's summary judgment motion should be granted on the discrimination claim.

### B. Retaliation

Title VII prohibits retaliation against persons who oppose unlawful employment practices or participate in an investigation or hearing under the statute. 42 U.S.C. § 2000e-3(a). The *McDonnell Douglas* analysis discussed above applies to retaliation claims that are based on circumstantial evidence. *Saketkoo*, 31 F.4th at 1000. To meet her prima facie burden, Crivelli must show that: (1) she engaged in an activity protected by Title VII; "(2) 'she suffered an adverse employment action'; and (3) 'a causal connection exists between the protected activity

20

and the adverse employment action.'" *Id.* (quoting *Brown v. Wal-Mart Stores E., L.P.*, 969 F.3d 571, 577 (5th Cir. 2020)).

Protected activity includes opposing any practice made unlawful by Title VII, as well as making a charge, testifying, assisting, or participating in an investigation, proceeding, or hearing under Title VII. *Anderson v. La. Dep't of Transp. & Dev.*, 836 F. App'x 304, 307 (5th Cir. 2020) (quoting *Douglas v. DynMcDermott Petrol. Operations Co.*, 144 F.3d 364, 372 (5th Cir. 1998)). "[A] vague complaint, without any reference to an unlawful employment practice under Title VII, does not constitute protected activity." *Davis v. Dallas Indep. Sch. Dist.*, 448 F. App'x 485, 493 (5th Cir. 2011) (collecting cases).

Crivelli argues that she engaged in protected activity when she filed a charge of discrimination against MCESD7 on October 26, 2018, and when she "complained to her supervisors, offered them written documentation of her complaints, and stated directly that FF Jarquin did not want women firefighters." ECF No. 29 at 22–23. There is no dispute that filing a charge of discrimination is a protected activity.

The complaints she made to the supervisors at KFD, however, are not so clearly protected activity. As discussed above, Crivelli testified that she met with Crowell and Ferguson on October 21, 2018. Crivelli's Decl. ¶ 31. She informed them of issues she was having with Jarquin and attempted to show Crowell and Ferguson the notes she had taken about her interactions with Jarquin. *Id.* ¶ 32. They refused to review her notes and advised her to handle the matter herself. *Id.* About two weeks later, Crivelli met with Massey and told her that Jarquin "doesn't like females in fire service." *Id.* ¶ 39. Crivelli declined Massey's offer to make a complaint; instead, Crivelli suggested that she would give Jarquin "a piece of [her] mind because [he]

was pretty rude." *Id.* In neither of these meetings did Crivelli identify an unlawful employment practice under Title VII.

Crivelli's complaints discussed above are precisely the type of "vague complaint" that does not identify any unlawful practice prohibited by Title VII. Crivelli merely complained about the behavior of a coworker. Jarquin's opinions, even if offensive and gender biased, did not rise to the level of a KFD employment practice. *See Winston v. United States Postal Serv.*, No. 22-30753, 2023 WL 4265797, at *1 (5th Cir. June 29, 2023) (citing *Davis*, 448 F. App'x at 493) (finding that the plaintiff's "vague human resources complaint was insufficient to constitute a protected activity for the purposes of Title VII because it did not reference any unlawful employment practice on the part of [her] employer"). However, because KFD did not make this argument in its motion, the court assumes for purposes of summary judgment that Crivelli satisfies the first prima facie element with regard to both her complaints about Jarquin and her filing a charge of discrimination against MCESD7.

The next element, an adverse employment action, requires evidence of a "materially adverse" employment action that is "harmful to the point that [it] could well dissuade a reasonable worker from making or supporting a charge of discrimination." *Paul v. Elayn Hunt Corr. Ctr.*, 666 F. App'x 342, 346 (5th Cir. 2016) (alteration in original) (quoting *Porter v. Houma Terrebonne Hous. Auth. Bd. of Comm'rs*, 810 F.3d 940, 945 (5th Cir. 2015)). The materiality requirement is intended to "separate significant from trivial harms." *Id.* (quoting *Aryain v. Wal-Mart Stores Tex. LP*, 534 F.3d 473, 484 (5th Cir. 2008)). "To determine whether an action is materially adverse, [the Fifth Circuit] look[s] to indicia such as whether the action affected 'job title, grade, hours, salary, or benefits' or caused 'a diminution in

prestige or change in standing among . . . co-workers'" *Id.* (quoting *Stewart v. Miss. Transp. Comm'n*, 586 F.3d 321, 332 (5th Cir. 2009)).

Crivelli's termination qualifies as a materially adverse employment action. *See Paul*, 666 F. App'x at 346 (citing *Wheat v. Fl. Par. Juv. Just. Comm'n*, 811 F.3d 702, 710 (5th Cir. 2016)). To the extent that Crivelli also claims that the unpleasantries at KFD or the investigation by Parker were materially adverse actions, Crivelli presented no evidence that either affected her job title, grade, hours, salary, or benefits, or caused more than trivial harm.

The third element of a retaliation prima facie case requires causal connection between the protected activity and the adverse action. *Saketkoo*, 31 F. 4th at 1000. Temporal proximity between the two satisfies the causal link at the prima facie stage. *See id.* at 1001. In late October, Crivelli reported to Smith that she planned to file discrimination charges against MCESD7 and informed Crowell and Ferguson of her issues with Jarquin. *See* Crivelli's Decl. ¶¶ 32, 35, 39. KFD terminated her employment in late December. Crivell's Decl. ¶ 49. This is likely sufficient to meet this element.

Having met her prima facie burden, Plaintiff shifts the burden to KFD to produce evidence of a legitimate, nondiscriminatory reason for terminating Crivelli's employment. As discussed above, KFD satisfies this burden. Thus, the burden shifts to Crivelli to show pretext. For retaliation claims, this element requires evidence that "but for" the engagement in protected activity, Crivelli would not have been terminated. *See Saketkoo*, 31 F. 4th at 1001–02 (citing *Long v. Eastfield Coll.*, 88 F.3d 300, 305 n.4 (5th Cir. 1996) ("[E]ven if a plaintiff's protected conduct is a substantial element in a defendant's

decision to terminate an employee, no liability for unlawful retaliation arises if the employee would have been terminated even in the absence of protected conduct."). The burden may be satisfied "by showing that a discriminatory motive more likely motivated her employer's decision." *Saketkoo,* 31 F.4th at 1002 (quoting *Brown,* 969 F.3d at 577). On summary judgment, Crivelli must "show a 'conflict in substantial evidence' on this issue." *Id.* (quoting *Brown,* 969 F.3d at 577). The court may consider, among other factors and evidence, "the strength of the plaintiff's prima facie case [and] the probative value of the proof that the employer's explanation is false." *Id.* (quoting *Brown,* 969 F.3d at 557).

Defendant argues that Crivelli produces no evidence suggesting that her termination was pretext for retaliation. The court agrees. Crivelli admitted at her deposition that she lacks knowledge of any facts showing that Wilson, who terminated her employment, did so in retaliation for reporting gender discrimination or for filing a charge of discrimination against MCESD7, her former employer. *See* Pl.'s Dep. at 47–48. Crivelli also admitted that she lacks knowledge of any facts that either Parker or Massey had a retaliatory motive. *See id.* at 54, 186. Crivelli argues that, when she informed Smith about the charge of discrimination against MCESD7, Smith gave Crivelli a "warning" that KFD employees were likely to know employees of MCESD7 and that she needed to "consider how to handle the matter with them if it became known." ECF No. 29 at 10 (quoting Smith's Decl. ¶ 7). Despite Crivelli's interpretation, this appears to have been nothing more than a professional discussion in which Smith offered Crivelli insight on what to expect.

In support of a finding of but-for causation, Crivelli argues that, before she "spoke up about FF Jarquin, nothing was

happening" and after she spoke up, "she was immediately investigated and terminated within weeks." ECF No. 29 at 25. That argument is a mere restatement of temporal proximity, which alone is not enough to meet her burden to show pretext. To survive the summary judgment motion, Crivelli must show a conflict in substantial evidence as to whether KFD would not have terminated Crivelli's employment for the policy violations cited in the termination memorandum: (1) but for her filing charges against MCESD7; or (2) but for her complaints about Jarquin. Crivelli presents no evidence in support of a causal link for either retaliation claim except temporal proximity. She does not argue that the reasons KFD gave for her termination were not true. As discussed above, she admits that those incidents occurred but simply disagrees with Wilson's decision to terminate her employment. However, Crivelli fails to present any evidence that Wilson's decision was based on, to any degree at all, her filing charges or reporting Jarquin's behavior. Thus, she falls well short of showing that she would not have been terminated but for her engaging in protected activity.

Crivelli does not argue that the "cat's paw" theory applies to satisfy pretext for retaliation. The court notes, however, Crivelli has not identified anyone with retaliatory animus who manipulated Wilson into terminating her employment. *See Saketkoo*, 31 F.4th at 1001 (stating that, although "cat's paw causation" may be sufficient to show retaliatory pretext, the plaintiff must point to evidence of a person with retaliatory animus who used the decisionmaker to bring about an intended retaliatory action).

Without evidence of pretext, Crivelli's retaliation claim cannot survive summary judgment. Defendant's summary judgment motion should be granted on the retaliation claim.

### 3. Conclusion

The summary judgment record does not raise a genuine issue of material fact as to pretext for either of Crivelli's claims for discrimination or retaliation. Those claims should be dismissed for that reason alone, and the court thus does not reach Defendant's argument that collateral estoppel bars Crivelli's retaliation claim for filing a charge of discrimination against MCESD7. Accordingly, the court recommends that Defendant's summary judgment motion be **GRANTED**.

The parties have fourteen days from service of this Report and Recommendation to file written objections. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72. Failure to timely file objections will preclude appellate review of factual findings or legal conclusions, except for plain error. *See Thomas v. Arn*, 474 U.S. 140, 147–49 (1985); *Rodriguez v. Bowen*, 857 F.2d 275, 276–77 (5th Cir. 1988).

Signed at Houston, Texas on July 20, 2023.

_____
Peter Bray
United States Magistrate Judge

26